The initial statute was ELIPA, the emergency statute. It was only supposed to be for two years until... That's Title II? Yes, Your Honor. And so, the plaintiffs whose initial prepayment dates fell within that first statute were actually given a choice. Go forward in Title II and get the benefits or make a sale under Title II. Or, switch when... Did Title II give the same sale option the other statute gave them? It did. It was a little less defined. The methodology is a little different. Title II is actually better, which is why the plaintiffs who had the chance chose to stay in Title II rather than to move to Title VI. But the sale option in Title II was based on appraisals of their property performed by their own appraisals. That was the basis of the market price. Their own appraisals. And so, in Title VI, what happened was each side did an appraisal and... Did you agree that they couldn't proceed under Title VI until the regulations were issued? They did have to wait under that. And when were the regulations issued? The regulations were issued, I believe, by 1992, Your Honor. But I don't know that for certain. Mr. Ginzer, in your brief, you argued that participation in this program was very advantageous to these landowners, apartment building owners. And you asserted that within months of entering the program, they entirely recovered their investment. Yes. Were there any findings about that, or is that just a sheer attorney argument? No, absolutely, Your Honor. We put on a tax expert, and what he did was there happened to be the only— first of all, the court experts said the only documentation of initial investment back to expectations was a prospectus that one of the properties used as a selling mechanism to get apartments. And we had a tax expert come in and say, take a look at it. And basically what he said is that you could, based on just the tax benefits alone, you could recoup your investment depending on what bracket you were in within one or two or three years. The question was, did the trial judge find that the investments were in fact recouped within months? No. What the trial judge did was, because the trial judge applied a test that basically the trial judge didn't look at, so he didn't make any factual findings, he said, yes, there were tax— So you're asking us to depend on something that was mentioned by one witness based on one document as to which there were no findings. No, Your Honor. With respect to investment back to expectation, we believe that the formulation of the test by the trial court was in error and that the first step would be to correct the formulation of the test. What the trial judge did was he—this is the question he asked. Did plaintiffs expect— The question I'm asking has to do with whether, as a common-sense matter, we can see that this was a great deal that hugely benefited the landowners because that's the contention you advance. Yes, Your Honor. And we believe that to a certain extent that is factual and that the court didn't make factual findings on it one way or the other. We also believe that there's a certain amount of common sense in this sense, Your Honor. If you want— Were their dividends paid each of the disputed years up to the cap, which I believe was 6 percent? The way it worked is they didn't happen every year, but if you didn't make them one year, you could accumulate the right to receive them, and so if you had a good year a couple of years down the road, you can get them all. And for the most part, these properties did pay those. But the dividends— Were you finished answering the Chief Judge's question? I didn't want to jump in if you were still— I could throw two more sentences on it, Your Honor. Okay. Then just remember me. Okay. Yes, sir. The dividends were significant, but quite honestly, they paled in comparison to three items. One was the fact that you got a HUD-insured interest rate of 1 percent. The second was that you could borrow—you could leverage 90 percent instead of the usual 20 or 15—20 or 25 percent that you would have to come in with your own money in a normal deal. And third, there's accelerated depreciation on these tax deals, which meant the tax benefits arose—to differ them from conventional—tax benefits arose earlier. And back then, you could sell the tax benefits, and so they were very good deals, which is why there were lines of people waiting for them. The point I wanted to make is this. You didn't get into these deals with the goal of getting out because you could have just built conventional properties and been out the whole time. You got into these deals for some other reason than the right to get out. And that other reason—the court never made any effort to figure out what is the reason that you got in because that was important. And the reason that you got in were low leverage, good tax benefits, low risk, and the other reasons I mentioned. And Judge Shaw. Thank you. Thank you, Mr. Dixon. Now, my question is on findings of fact. We have findings of fact throughout this lengthy opinion. Am I correct in thinking that your position is—you don't—and please correct me if I'm mischaracterizing it. It didn't seem to me that in your brief and in an oral argument you say, okay, finding of fact A and B on page 52 is incorrect. Rather, you seem to be saying the judge didn't make findings that he should have. Yes. For the most part, because the court said— And they didn't see a challenge to the findings that were made. And I don't want to say there aren't any. There aren't many, primarily because the court didn't make the findings. For example, the court never made a finding about whether these properties could have sold at market rate because it concluded it wasn't relevant. And so it never made a finding about how important the tax benefits were. It said there are these tax benefits, but it doesn't matter because they don't—the existence of them doesn't affect the question that these— So without pinning you down to the wall, I mean your view is that in broad scope, I don't challenge the findings that were made. But—and this is a big but from your standpoint—the judge failed to make findings that he should have. He definitely failed to make findings that he should have, and he failed, more importantly, to formulate the questions. I just don't want to sign off on the broad brush because there's probably some fact or facts that we do challenge, but I don't want to— That was just the sense I got from the brief. Yes, Your Honor. With respect to the temporary—the issue of the temporary taking, the court says we're going to apply this test because there is a temporary taking. But as plaintiffs have indicated, just one property, San Aguilar Garden, they sold while they were still under these regulations. So that wouldn't even be a temporary taking. They're alleging a permanent taking, which would mean that we go back to the change in value test. The problem with picking a test based on whether you define something as temporary or permanent is it's an arbitrary distinction in a lot of cases, and it shouldn't drive the process. I see that I'm using my time. I'm happy to answer any more questions. And four minutes more. Yes, Your Honor. Thank you both. We'll take the case under advisement. You keep going. You keep going.